TERI A. STANG–STARR, APPELLANT, V. ROBERT T. BYINGTON, APPELLEE.

532 N.W.2d 26

Filed May 26, 1995. No. S-94-355.

William A. Wieland and Thomas K. Massey, of Healey & Wieland Law Firm, for appellant.

William M. Lamson, Jr., William R. Settles, and Charles F. Maxwell III, of Kennedy, Holland, DeLacy & Svoboda, for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to verdict, the district court dismissed this action wherein the plaintiff–appellant, Teri Stang–Starr, claims she was damaged by the negligent failure of the defendant–appellee, Dr. Robert T. Byington, to properly diagnose and treat abnormalities in her cervix. Stang–Starr then successfully moved to bypass the Nebraska Court of Appeals and here asserts that the district court erred by (1) refusing to permit her to question her medical experts regarding medical texts and treatises upon which they relied in their testimony and (2)

inconsistently receiving in evidence Byington's offer of the examining laboratory's explanation of its classification system upon which he relied. We affirm.

## II. SCOPE OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 247 Neb. 547, 529 N.W.2d 33 (1995).

## III. FACTS

### 1. MEDICAL DEVELOPMENTS

On May 23, 1986, Byington conducted an examination of Stang–Starr, which included obtaining a Pap smear. The procedure involved obtaining a scraping of cells from the cervix of the uterus and placing them on a slide, which Byington sent to the examining laboratory, International Cancer Screening Laboratories Inc., for a pathological examination for signs of cervical cancer.

Sometime between June 7 and 10, 1986, Byington received from the examining laboratory a report dated June 4, which read: "Cellular changes are present consistent with moderate dysplasia. Papanicolaou Class II. Repeat smears in two months. Estrogen effect; slight." The term "dysplasia" means abnormal growth.

On or about October 10, 1986, Stang–Starr received a telephone call from a nurse in Byington's office, informing Stang–Starr that her Pap smear report showed an abnormal finding of class II and that she should make an appointment to return to the office.

When Stang–Starr returned to Byington's office on October 27, 1986, he obtained another Pap smear and sent the sample to the examining laboratory. The laboratory's November 3, 1986, report read: "Negative for malignant cells (Class I). Additional estrogen effect; slight." On or about November 7, a nurse from Byington's office informed Stang–Starr of the reported results from this second Pap smear. The nurse

instructed Stang–Starr to contact Byington in 6 months for another Pap smear.

As she began experiencing a heavier menstrual flow, Stang–Starr scheduled an appointment for January 4, 1988. Byington's examination on this occasion revealed cervical irritation and vaginitis, for which he prescribed treatment and scheduled a return visit.

On February 3, Byington obtained a third Pap smear and performed a colposcopy, a microscope–aided visual examination of the cervix and vagina. The colposcopy revealed an abnormality, and Byington performed a biopsy of the affected area; that is, he removed a tissue sample for study. On February 5, Byington learned that the biopsy revealed the presence of cancer and notified Stang–Starr by telephone. The examining laboratory's report with respect to the third Pap smear, bearing a date of February 12 read: "Neoplastic cells are present consistent with squamous cell carcinoma, keratinizing type. Papanicolaou Class V. Follow up tissue studies. Additional findings: Endocervical cells, inflammation."

Byington's office contacted the examining laboratory to inquire about the November 3, 1986, report which had failed to report any malignant cells or abnormalities in the second Pap smear. According to the examining laboratory's Dr. Sharon Rosenthal, a mistake had been made. The report should have indicated that the sample sent was unsatisfactory because the cells were obscured by blood and could not be evaluated properly. During a meeting at his office with Stang–Starr and her husband, Byington informed them of the examining laboratory's error and of the possibility that Stang–Starr's earlier class II dysplasia might have developed into a class V cancer during the interval in which Byington relied on the faulty report.

Byington referred Stang–Starr to a cancer specialist at the University of Nebraska Medical Center, where she was diagnosed as having a stage IV carcinoma.

## 2. Trial Developments

During the trial, Stang–Starr called two physicians to testify on her behalf as expert witnesses: Dr. Manford Oliphant and

Dr. William Woodard.

Oliphant testified that the American College of Obstetricians and Gynecologists, the primary organization for obstetricians and gynecologists, publishes journals and a number of technical and informational bulletins. These items provide one of the sources Oliphant used to establish appropriate procedures in the practice.

When asked whether he had reviewed any technical bulletins in preparation for his testimony in this case, Oliphant responded that he had, along with reviewing other journals, textbooks, and excerpts from textbooks. Oliphant also testified that obstetricians and gynecologists develop information for their daily practices from textbooks and technical bulletins.

Based on his knowledge and information obtained from textbooks, medical literature, and personal experience, Oliphant formed an opinion, to a reasonable medical probability, as to the standard of care required of a board-certified obstetrician in May 1986 in Lincoln or similar communities. He then testified that he had read a particular technical bulletin issued by the college as a predicate to formulating some of the opinions on dysplasia to which he had testified. When Stang-Starr offered that bulletin into evidence, Byington successfully interposed a hearsay objection.

Stang-Starr then made an offer of proof of the bulletin and of material found in more than 12 textbooks concerning gynecology and colposcopy. She proposed that Oliphant would identify the text as authority in the field, identify the text as a basis of opinion, and identify and read specific passages of the material upon which Oliphant relied in testifying. The district court sustained Byington's hearsay objections to the offers.

Woodard then took the stand and testified that in forming his opinion, he had reviewed 5 or 6 textbooks, other specifically named textbooks, 15 to 18 journal articles, and the college bulletin identified earlier. In making an offer of proof, Stang-Starr represented that were Woodard allowed to respond to questions about those medical authorities, he would describe the textbooks by title, author, and date of publication, but would not attempt to quote from the actual text. Byington's hearsay objection to the offer was sustained.

During his cross–examination, Woodard was asked:

[Byington's counsel:] Do you think — strike that. Let's talk about the length of the disease, if we can, for a moment. How long does it normally take, Doctor, from — for this disease, I'm probably using a bad word when I use normal. In the literature, let me use it that way, what does it say with regard to the number of years it takes on the average for the cancer to progress from dysplasia to true invasive cancer? How long is that span of time normally?

Woodard responded, "A number of months to several years." During cross–examination, Woodard was also asked, "Isn't it true that the literature says that this is a slowly progressing cancer in general?" Woodard responded, "In 7 to 20 percent."

On cross–examination, Woodard also testified generally as to what the medical literature suggested. When asked on cross–examination whether he had experienced a patient's cancer to progress from normal to invasive within 9 months, he replied that the "literature suggests that the original Pap smear was improper or was one of those false negatives, from 15 to 40 percent, and that the cancer doesn't go that rapidly."

Woodard was also asked during cross–examination whether "physicians are told in the literature what characteristics go into making up a high–risk patient." Woodard confirmed that such was the case.

On redirect examination, Woodard was asked whether in his opinion there existed in May 1986 diagnostic chaos as to how a gynecologist should have responded to moderate dysplasia in Pap smears. Woodard responded that there was no confusion as to what to do about dysplasia from a gynecologist's standpoint. When asked what the basis for his statement was, Woodard began to reply about the technical bulletin referred to earlier. Byington objected on the basis of hearsay and lack of foundation. Stang–Starr then withdrew the question, and the redirect examination continued with the following questions and answers:

[Stang–Starr's counsel:] Dr. Woodard, in the [college] technical bulletin . . . did that bulletin, from your review, specifically address the issue of whether or not there was any diagnostic chaos with reference to what gynecologists

did when they obtained an abnormal Pap smear?

A. There was none.

Q. Okay. Let me hand you, Dr. Woodard, a copy — first of all, will you verify what's been marked as . . . the . . . technical bulletin . . . and refer you to page 3 under "Evaluation of Abnormalities."

First, would you take a moment and read to yourself those two paragraphs.

A. (Witness complies.) Yes.

Q. Have you had a chance to do so?

A. Yes.

Q. Do those two paragraphs address the approach to an abnormal Pap smear when the report comes back?

A. Yes, they do.

Q. Would you please give us your interpretation of those two paragraphs from that . . . bulletin?

[Byington's counsel:] To which [Byington] objects, Your Honor. The witness has already indicated that in his opinion the document indicates that there is no diagnostic chaos.

The objection was sustained.

During the presentation of his case, Byington introduced an eight-page document bearing the examining laboratory's name, which explained the classification system it used. Stang–Starr raised a hearsay objection to the document, which the district court ultimately sustained in part and in part overruled, editing the document so as to admit only those portions which define "diagnostic cytology," explain the examining laboratory's procedures in screening slides, and explain the classification of dysplasia the laboratory used.

## IV. ANALYSIS

### 1. REJECTION OF AUTHORITIES

When offered to prove the truth of matters asserted in them, learned writings, such as treatises, books, and articles regarding specialized areas of knowledge, are clearly hearsay. 2 McCormick on Evidence § 321 (John W. Strong 4th ed. 1992). There was no exception for learned treatises at common law, and medical textbooks and professional articles are not

admissible to prove the substantive facts stated therein. *Hickok v. G. D. Searle & Company*, 496 F.2d 444 (10th Cir. 1974). Neither do the Nebraska Evidence Rules contain such an exception to the hearsay rule. See Neb. Evid. R. 801 and 803, Neb. Rev. Stat. §§ 27-801 and 27-803 (Reissue 1989).

We have permitted the use of standard medical texts and other authorities for the purpose of impeaching, contradicting, or discrediting a witness through cross-examination. *Fonda v. Northwestern Public Service Co.*, 138 Neb. 262, 292 N.W. 712 (1940); *Winters v. Rance*, 125 Neb. 577, 251 N.W. 167 (1933); *Hutchinson v. State*, 19 Neb. 262, 27 N.W. 113 (1886). We have also permitted the use of such materials for the foregoing purposes during rebuttal testimony. *Oliverius v. Wicks*, 107 Neb. 821, 187 N.W. 73 (1922).

We have not, however, permitted the use of such materials as independent evidence of the opinions and theories advanced by the parties. *Darnell v. Panhandle Coop. Assn.*, 175 Neb. 40, 120 N.W.2d 278 (1963); *Van Skike v. Potter*, 53 Neb. 28, 73 N.W. 295 (1897). See, also, *Hutchinson, supra.* As explained in *Van Skike*, 53 Neb. at 42, 73 N.W. at 299:

"[E]ven if they are regarded as authoritative, [medical texts] cannot be read to the jury as independent evidence of the opinions and theories therein expressed or advocated. One objection to such testimony is that it is not delivered under oath; a second objection is that the opposite party is thereby deprived of the benefit of a cross-examination; and a third and perhaps a more important reason for rejecting such testimony is that the science of medicine is not an exact science. There are different schools of medicine, the members of which entertain widely different views, and it frequently happens that medical practitioners belonging to the same school will disagree as to the cause of a particular disease, or as to the nature of an ailment with which a patient is afflicted, even if they do not differ as to the mode of treatment. Besides, medical theories, unlike the truths of exact science, are subject to frequent modification and change, even if they are not altogether abandoned. For these reasons it is very generally held that when, in a

judicial proceeding, it becomes necessary to invoke the aid of medical experts it is safer to rely on the testimony of competent witnesses who are produced, sworn, and subjected to a cross-examination, than to permit medical books or pamphlets to be read to the jury."

Neither, contrary to the contention of Stang-Starr, does *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990), suggest otherwise. It is true that after noting in *Capps* that the "*references* to research and literature were not offered to prove the truth of their contents, but as a basis for [defendant's] testimony," we wrote that "[e]xpert witnesses quite often rely on sources of research and literature as bases of their opinions, and a *reference* to those sources during testimony does not reduce that *testimony* to hearsay." (Emphasis supplied.) *Id.* at 22, 458 N.W.2d at 746. Read carefully, *Capps* contains nothing which implies that the material referred to in the testimony at issue was even offered, let alone received, in evidence; the opinion merely recites that the material was referred to in the witness' testimony. In that regard, the *Capps* opinion stands for nothing more than that a witness' reference during testimony to research sources and literature does not convert that witness' testimony into inadmissible hearsay.

While it is likely that the practice of medicine is more of a science today than it was almost a century ago when we decided *Van Skike*, the fact remains that the *Van Skike* reasoning continues to be sound. We are thus not persuaded that we should abandon our longstanding rule in this regard.

Nor does the fact that the out-of-court statements contained in the authorities were offered in the guise of forming the bases for the testifying experts' opinions alchemically transmute them from inadmissible hearsay into admissible nonhearsay. When Stang-Starr attempted to elicit testimony from her witness concerning what a particular authority has reported about an issue, she was attempting to use her witness to recite the opinion of each authority cited instead of eliciting her witness' expert opinion derived from the witness' own knowledge and experience. The witness was merely seeking to act as a conduit for inadmissible hearsay. The recitation of a passage by a nontestifying authority, even if such is in conformity with the

opinion of the testifying expert, is hearsay.

As observed in *United States v. Williams*, 431 F.2d 1168, 1172 (5th Cir. 1970), *aff'd en banc* 447 F.2d 1285 (5th Cir. 1971), *cert. denied* 405 U.S. 954, 92 S. Ct. 1168, 31 L. Ed. 2d 231 (1972):

> "If the witness has gone to only one hearsay source and seeks merely to summarize the content of that source, then he is acting as a summary witness, not an expert. Since he is introducing the content of the extrajudicial statements or writings to prove truth, his testimony, like its source, is hearsay and is inadmissible unless the source qualifies under an exception to the hearsay rule. When, however, the witness has gone to many sources—although some or all be hearsay in nature—and rather than introducing mere summaries of each source he uses them all, along with his own professional experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as an attempt to introduce hearsay in disguise."

See, also, *Standard Oil Company of California v. Moore*, 251 F.2d 188 (9th Cir. 1957), *cert. denied* 356 U.S. 975, 78 S. Ct. 1139, 2 L. Ed. 2d 1148 (1958); *H. & H. Supply Co. v. United States*, 194 F.2d 553 (10th Cir. 1952); *Hannan v. United States*, 131 F.2d 441 (D.C. Cir. 1942).

Accordingly, the district court did not err in sustaining Byington's objections to the proffered evidence or the offers of proof made in regard to the evidence.

### 2. Receipt of Explanation

Stang–Starr next contends the district court erred by inconsistently receiving in evidence as offered by Byington the examining laboratory's explanation of its classification system. Stang–Starr contends that the document duplicated information contained in the college bulletin the district court would not permit her to put in evidence.

However, as received, the Byington exhibit consists of two partial pages reciting the information set forth earlier in part III. In contrast, the bulletin consists of $4^{1/2}$ pages of recommendations concerning the frequency of diagnostic screening of patients with differing risk factors, techniques for

conducting the screenings, and methods of evaluation. The bulletin also reviews the terminology used in reporting pathological findings and criticizes the particular method of classification used by the examining laboratory in this case. Thus, it is disingenuous to suggest that the two items are the same.

Moreover, Byington offered the exhibit not to establish the truthfulness of its contents, but to establish the system of classification used by the examining laboratory. The document therefore was not hearsay. Rule 801(3), § 27-801(3); *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993) (extrajudicial statement not offered to prove truth of matter asserted not hearsay).

Consequently, the district court did not err in admitting the laboratory's explanation.

### V. JUDGMENT

The record failing to sustain Stang–Starr's assignments of error, the judgment of the district court, as first noted in part I, is hereby affirmed.

AFFIRMED.