734 N.W.2d 739 (2007)
273 Neb. 1013
Gerald JACKSON, Appellee,
v.
BROTHERHOOD'S RELIEF AND COMPENSATION FUND, Appellant.
No. S-06-177.
Supreme Court of Nebraska.
July 20, 2007.
*742 Renee Eveland, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., Lincoln, for appellant.
Andrew W. Snyder, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, Scottsbluff, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

I. NATURE OF CASE
Gerald Jackson sued Brotherhood's Relief and Compensation Fund (the Fund), alleging that the Fund breached its agreement to pay him "`Held Out of Service'" benefits in the event he was suspended by his employer. Following a trial, a jury found in favor of Jackson. The district court awarded attorney fees and costs to Jackson in addition to the damages found by the jury. The Fund appealed.

*743 II. SCOPE OF REVIEW
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. In re Trust of Rosenberg, ante, 273 Neb. 59, 727 N.W.2d 430 (2007).
Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. Worth v. Kolbeck, ante, 273 Neb. 163, 728 N.W.2d 282 (2007).
A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. Roth v. Wiese, 271 Neb. 750, 716 N.W.2d 419 (2006).

III. FACTS

1. JACKSON DOES NOT PROVIDE URINE SAMPLE FOR RANDOM DRUG TEST
Jackson was employed as an engineer for Burlington Northern Santa Fe Railway (BNSF). When he reported to work on January 2, 2003, he was asked to provide a urine sample for a random drug test. Jackson had successfully performed similar tests in the past, but on this day, he stated that he could not urinate. Over a 3-hour period, Jackson neither provided nor attempted to provide a urine sample. He said he had urinated at home before leaving for work and that he lacked "the urge to go." He also said he had eaten a large meal just before work, and he refused to drink any liquid because he claimed he would suffer from indigestion and heartburn if he drank anything.
Because Jackson did not provide a urine sample, he was "pulled out of service" by BNSF. A formal investigation was initiated by the railway. BNSF advised Jackson that he would be "withheld from service pending results of this investigation."
During a BNSF investigative hearing held March 19, 2003, Jackson asserted several reasons why he did not furnish the required urine sample. He said he had urinated 15 minutes before leaving for work. He said he was taking a prescription drug called Effexor, and he claimed that a side effect of the drug was difficulty in urinating. Jackson also claimed he had been diagnosed with prostatitis, which he said could cause a person to have trouble urinating. He claimed he had been afflicted with diarrhea for several days before the drug test and that this illness could have caused dehydration. Jackson further claimed he had eaten a large meal at home before work and thus felt too full to drink liquids to help him urinate. He stated that drinking liquids after such a large meal would have given him indigestion.
Following the BNSF investigation, Jackson was suspended for 9 months for failing to provide a urine sample without a valid medical reason, in violation of the BNSF alcohol and drug policy.

2. JACKSON GETS No RELIEF FROM FUND
In consideration for the payment of dues, the Fund provides benefits to railroad workers who are employed in hazardous occupations. A member is compensated when he or she has been held out of service for disciplinary reasons if the suspension was not the result of an intentional rule violation. A member of the Fund must be a member of the local railroad union. The Fund bases its determination of benefits eligibility upon the results of the grievance process provided under the member's collective bargaining agreement. The terms of the agreement between the Fund and a member are contained in the *744 Fund's "constitution," which governs the claims process.
Jackson was a member of the Fund on January 2, 2003. In accordance with the agreement, Jackson underwent a formal investigation by his employer, BNSF, and was represented at the BNSF hearing by the union. He timely submitted a claim to the Fund for benefits, along with copies of the transcript and exhibits from the BNSF investigative hearing.
The Fund denied Jackson's claim because his suspension was based upon the "refusal to perform any duty or service for the employer" or the "failure to take . . . or pass any examination or test required by the employer." The Fund also based its denial of benefits to Jackson on the definition of the term "`Held Out of Service'" as set forth in the Fund's constitution. A member could claim benefits if he had been permanently or temporarily
relieved by his employer from the performance of his said usual duties after formal investigation, at which said employee was properly represented by a representative of the local grievance committee or other employee, as discipline for an offense or offenses, not, however, because of any willful or intentional violation or infraction of any order. . . rule . . . or regulation . . . of his employer . . . .

(Emphasis supplied.)

3. JACKSON SUES FUND AND PREVAILS AT TRIAL
Jackson filed a complaint against the Fund in the district court for Box Butte County. He alleged that the Fund had breached its contract with him by failing to compensate him while he was suspended. Jackson sought damages and attorney fees and costs.
A jury trial was held in July 2005. Evidence was adduced concerning Jackson's failure to provide a urine sample for the BNSF drug test and the Fund's denial of benefits for Jackson's suspension from work. Over the Fund's objection on grounds of hearsay, insufficient foundation, and relevance, exhibits 17 and 18 were received into evidence with no limiting instruction. Exhibit 17 contained the exhibits from the BNSF investigative hearing. Exhibit 18 was a complete transcript of the testimony from that hearing.
The jury found in Jackson's favor and awarded him $53,010, the amount of damages to which the parties had stipulated. The district court sustained Jackson's motion for attorney fees and costs.
The Fund's motion for new trial was overruled, and the Fund appealed. We transferred the appeal to our docket in accordance with our statutory authority to regulate the case-loads of the appellate courts of this state. See Neb.Rev.Stat. § 24-1106(3) (Reissue 1995).

IV. ASSIGNMENTS OF ERROR
The Fund claims, restated, reordered, and summarized, that the district court erred (1) in admitting into evidence exhibits 17 and 18, (2) in overruling the Fund's motion for a new trial, (3) in overruling the Fund's motion for a directed verdict, and (4) in awarding attorney fees and costs to Jackson.

V. ANALYSIS

1. ADMISSION OF EXHIBITS 17 AND 18
In proceedings in which the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. In re Trust of Rosenberg, ante, 273 Neb. 59, 727 N.W.2d 430 (2007). Preliminary questions concerning *745 the admissibility of evidence are determined by the trial judge. See Neb. Evid. R. 104, Neb.Rev.Stat. § 27-104 (Reissue 1995). When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. Worth v. Kolbeck, ante, 273 Neb. 163, 728 N.W.2d 282 (2007).
Over the Fund's objections, exhibits 17 and 18 were received into evidence. Exhibit 17 contained the exhibits submitted at the BNSF investigative hearing. Exhibit 18 was a transcript of that hearing. The Fund objected to the admission of these exhibits on the grounds of hearsay, insufficient foundation, and relevance.

(a) Alleged Medical Reasons for Not Providing Urine Sample
During the BNSF investigative hearing, Jackson claimed he was unable to urinate for the random drug test due to medical reasons. He testified that he had been diagnosed with prostatitis, which he said can cause a person to experience difficulty in urinating. He based this claim on information gathered from two sourcesa book entitled "Prescription for Nutritional Healing," by Phyllis A. Balch and James F. Balch, and a medical encyclopedia. Jackson read aloud from sections in these sources addressing prostatitis.
Jackson further described difficulty in urinating as a side effect of a prescription medication called Effexor, which he was taking at the time of the BNSF drug test. Jackson stated that Effexor "probably had the biggest part of my not being able to urinate." Jackson relied upon and read aloud from the prescribing information for Effexor published by the drug's manufacturer, which listed dehydration and impairment of urination as side effects of the drug. Jackson maintained that a correlation existed between the use of Effexor and his inability to provide a urine sample "because of all the [drug's] side effects." When Jackson attempted to testify about these side effects at trial, however, the district court sustained the Fund's objection on foundation.
Jackson also claimed in the BNSF hearing that he did not drink liquids to help him urinate during the BNSF drug test because drinking liquids would have given him indigestion. He said he had eaten a large meal before work and opined that "`[d]rinking liquids with meals contributes to indigestion because it dilutes the enzymes needed'" for digestion. This claim was based on the nutrition book described above, and Jackson read aloud from a section about indigestion.
The information Jackson submitted at the BNSF hearing, including the prescribing information for Effexor and the excerpts from the nutrition book and medical encyclopedia, were all part of exhibit 17, which was admitted at trial. Jackson's entire testimony from the hearing, during which he testified about and read from those materials, was received into evidence at trial as exhibit 18, the transcript from the hearing.
Under Neb. Evid. R. 702, Neb. Rev.Stat. § 27-702 (Reissue 1995), a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness is qualified as an expert. Carlson v. Okerstrom, 267 Neb. 397, 675 N.W.2d 89 (2004). Opinion evidence which is not supported by appropriate foundation is not admissible. Stukenholtz v. Brown, 267 Neb. 986, 679 N.W.2d 222 (2004).
The record provides no indication that Jackson was qualified to testify as an expert about the symptoms of prostatitis, the causes of indigestion, or the side effects of the drug Effexor. However, his opinion that each of these items contributed to his *746 alleged inability to provide a urine sample was presented to the jury at trial in the form of exhibit 18, the hearing transcript. Furthermore, no foundation was laid at trial for the prescribing information and medical texts from which Jackson read aloud and on which he based his testimony at the BNSF hearing. This information was placed before the jury through exhibit 17.
In Stang-Starr v. Byington, 248 Neb. 103, 532 N.W.2d 26 (1995), we stated that standard medical texts and other authorities may be used for the purpose of impeaching, contradicting, or discrediting a witness through cross-examination and during rebuttal testimony; however, such authorities may not be used as independent evidence of the opinions and theories advanced by the parties. Since Stang-Starr, Nebraska has adopted the learned-treatise hearsay exception. See 1999 Neb. Laws, L.B. 64, § 1. With such adoption, statements from certain published treatises, periodicals, or pamphlets may be admissible. See Neb. Evid. R. 803(17), Neb. Rev.Stat. § 27-803(17) (Cum. Supp. 2006). However, the foundational requirements for their admission must still be met. For example, the writing must be established as a reliable authority. See id. Moreover, learned treatises that have been established as reliable authority are admissible into evidence only to the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination. Breeden v. Anesthesia West, 265 Neb. 356, 656 N.W.2d 913 (2003). Even then, statements from such writings may be read into evidence but may not be received as exhibits. See § 27-803(17).
In this case, there was no foundation laid at trial for the documents Jackson read from and submitted at the BNSF hearing. The jury should not have been permitted to consider this evidence at trial.

(b) Results of March 2003 Drug Tests
During the BNSF investigative hearing, Jackson said that drug tests conducted at his own expense "prove[d] that there were no illegal drugs in [his] system before the day in question, during, or after." He submitted documents purporting to show that in March 2003, samples of Jackson's hair were tested by two laboratories for the presence of certain drugs within a 90-day time period. Negative results were shown. At trial, these documents were included in exhibit 17, and Jackson's testimony about the drug tests was contained in exhibit 18.
It goes without saying that to be admissible, testimony and exhibits concerning the results of drug tests must have sufficient foundation. In Priest v. McConnell, 219 Neb. 328, 363 N.W.2d 173 (1985), we found that insufficient foundation had been laid for testimony regarding the testing of the decedent's blood and urine for alcohol when there was no evidence as to the origin of the urine sample and, at best, the chain of custody concerning the blood sample was equivocal. In Raskey v. Hulewicz, 185 Neb. 608, 177 N.W.2d 744 (1970), the trial court refused to admit evidence as to the result of a urine test due to lack of foundation. Affirming this ruling, this court held that the authenticity of the urine sample must be unequivocally established before its admission into evidence. In Houghton v. Houghton, 179 Neb. 275, 137 N.W.2d 861 (1965), the results of blood tests conducted to establish paternity were admitted because they were supported by testimony of the doctor who supervised the tests.
In the present case, the purported results of the March 2003 forensic hair analyses and Jackson's testimony concerning them were incorporated in exhibits 17 and *747 18, which were admitted into evidence. However, no competent evidence was presented of the origin of the samples and when they were obtained. Admission on such insufficient foundation would be the equivalent of allowing the defendant in a paternity case to offer a sample of blood as his own without establishing its origin by independent evidence. Neither was any evidence presented about the testing itself. We need not delve into what type or how much foundation was required for the admissibility of the results of Jackson's forensic hair analyses. Suffice it to say that in this case, there was no foundation laid at trial, and therefore, the results of the March 2003 drug tests and Jackson's testimony about them at the BNSF hearing should not have been admitted.

(c) Inadmissibility of Exhibits 17 and 18
The Fund objected to the admission of exhibits 17 and 18 on the basis of insufficient foundation. If a general objection on the basis of insufficient foundation is overruled, the objecting party may not complain on appeal unless (1) the ground for exclusion was obvious without stating it or (2) the evidence was not admissible for any purpose. Ford v. Estate of Clinton, 265 Neb. 285, 656 N.W.2d 606 (2003). In this case, the first criterion is met.
When exhibits 17 and 18 were introduced at trial, Jackson testified that exhibit 17 contained "all the exhibits that were in the [BNSF] formal investigation." He further stated that exhibit 18 was "the complete transcript of the investigation." The foundation laid for these exhibits consisted of Jackson's testimony that he was required by the Fund's constitution to send these items to the Fund along with his claim for benefits. However, at trial, it was never disputed that Jackson had properly submitted his claim for benefits. In the Fund's admissions, already in evidence, it acknowledged that Jackson had "provided transcript, letter of discipline and information for submission of claim benefits." The parties stipulated during trial that Jackson had properly submitted his claim for benefits in accordance with the Fund's constitution. Thus, while Jackson unnecessarily testified why he had submitted exhibits 17 and 18 to the Fund, the testimony failed to establish the admissibility of the 39 separate documents contained in exhibit 17 or the 122 single-spaced pages of hearing testimony encompassed in exhibit 18.
Insufficient foundation was laid for Jackson's opinions regarding medical causation, the excerpts from the medical and nutrition books, the prescribing information for Effexor, and the results of the forensic hair analyses. Evidence that would not have made it through the front door of admissibility nevertheless made its way to the jury through the back door, cloaked as exhibits 17 and 18. We conclude that the district court abused its discretion in admitting exhibits 17 and 18 into evidence.

(d) Reversible-Error Analysis
To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted or excluded. Koehler v. Farmers Alliance Mut. Ins. Co., 252 Neb. 712, 566 N.W.2d 750 (1997). Testimony objected to which is substantially similar to evidence admitted without objection results in no prejudicial error. Id. In the present case, exhibits 17 and 18 were the only evidence that established a correlation between Jackson's failure to provide a urine sample and the condition of prostatitis, the side effects of Effexor, and indigestion.
Although other evidence at trial indicated that Jackson had been diagnosed with prostatitis, no other evidence established a *748 causal connection between the failure to provide a urine sample for the BNSF drug test and this condition. The office notes of Dr. Robert Graves, a urologist, were in evidence. He examined Jackson and diagnosed him with prostatitis a week after the BNSF drug test, but the notes do not state that prostatitis caused (or could have caused) Jackson to be incapable of providing a urine sample. In fact, in a letter to Jackson dated January 23, 2003, Graves was unable to "give a medical explanation for [Jackson's] inability to give a urine specimen during the three-hour period" on January 2. Graves wrote that "the inability to give the urine specimen would be more related to dehydration rather than from the prostatitis itself," and he encouraged Jackson to "drink several glasses of water" the next time he was required to provide his employer a urine sample.
Evidence regarding the side effects of Effexor was presented to the jury only through exhibits 17 and 18. When Jackson attempted to testify at trial about the drug's side effects, the district court sustained the objection as to lack of foundation. As to indigestion, Jackson was permitted to testify that he sometimes got indigestion if he drank liquids after eating a large meal; however, a scientific explanation for indigestion (the "`dilut[ion]'" of "`enzymes'") came in only through exhibits 17 and 18. Finally, the jury was presented with the results of the March 2003 drug tests only in exhibits 17 and 18. Accordingly, the evidence contained in exhibits 17 and 18 was not merely cumulative.
The Fund argues that the admission of exhibits 17 and 18 was presumptively prejudicial because the Fund was unable to cross-examine or rebut Jackson's unqualified opinions and documents contained therein and because the record does not disclose whether the evidence influenced the jury verdict. Error in the admission of evidence is presumed to be prejudicial when the evidence admitted may have influenced the verdict or affected unfavorably the party against whom it was admitted. Kvamme v. State Farm Mut. Auto. Ins. Co., 267 Neb. 703, 677 N.W.2d 122 (2004). Where it cannot be gleaned from the record that evidence wrongfully admitted did not affect the result of the trial unfavorably to the party against whom such evidence was admitted, reception of that evidence must be considered prejudicial error. Id.
In considering what effect the admission of exhibits 17 and 18 may have had on the jury, we note that the jury's attention was directed to the BNSF investigative hearing and the information submitted therein. References to the hearing were made throughout trial. Jackson testified that exhibit 17 contained all the documents submitted at the hearing and that exhibit 18 was the complete transcript of the hearing. Moreover, although Jackson was not permitted to testify about the side effects of Effexor, the jury was essentially told that it could find information about these side effects in exhibit 17. The following colloquy transpired during the redirect examination of Jackson:
Q[:] Were you aware that [E]ffexor has side effects which would affect urination?
[Counsel for the Fund]: I'll object to the form, object on hearsay, and foundation and form of the question.
THE COURT: The objection is sustained.
Q[:] . . . Jackson, you provided the [Fund] and [its] attorney the book of exhibits, correct?
A[:] Yes, I did.
Q[:] It's been received by the Court. Didn't you provide them the side effects of urination for [E]ffexor?

*749 A[:] Yes.
Q[:] How did you get that?
A[:] I wrote the manufacture[r] of the drug . . . I was taking.
Q[:] Did they respond to you and send you back something that listed the side effects?
A[:] Yes.
Q[:] Did it indicate it can affect urination?
[Counsel for the Fund]: I'll object on foundation.
At this point, the parties approached the bench and an off-the-record discussion was had between the parties and the court.
The overall issue at trial was whether Jackson was entitled to benefits pursuant to the Fund's constitution. In order to make such a finding, the jury had to determine that Jackson did not "willful[ly] or intentional[ly]" violate any order, rule, or regulation of his employer, BNSF. The BNSF alcohol and drug policy authorized a 9-month suspension for an employee who failed to provide a urine sample for a drug test "without a valid medical reason." Thus, the key question for the jury was whether Jackson simply refused to provide a urine sample for the drug test or whether he was physically incapable of urinating at that time.
The admission of exhibits 17 and 18 into evidence could have unfairly prejudiced the Fund in a number of ways. The jury could have accepted as fact Jackson's unqualified opinions relating to possible medical reasons for his alleged inability to urinate on January 2, 2003. The jury could have read the material submitted at the BNSF hearing and concluded that prostatitis and the taking of Effexor contributed to Jackson's failure to provide a urine sample. The results of the March 2003 drug tests were susceptible to being used by the jury as proof that Jackson had nothing to hide in the BNSF drug test and therefore that he must have been physically incapable of providing a urine sample. Because we are unable to determine that exhibits 17 and 18 did not affect the result of the trial unfavorably to the Fund, we conclude that reception of that evidence was prejudicial and reversible error.

2. MOTION FOR NEW TRIAL
The Fund's argument concerning the denial of its motion for new trial is tied to its argument regarding the admission of exhibits 17 and 18. The Fund argues that its motion for new trial should have been sustained because the admission of exhibits 17 and 18 was presumptively prejudicial. A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. Roth v. Wiese, 271 Neb. 750, 716 N.W.2d 419 (2006). Having determined that the admission of exhibits 17 and 18 was prejudicial error, we further conclude that the district court abused its discretion in overruling the Fund's motion for new trial.

3. MOTION FOR DIRECTED VERDICT
The Fund's assignment of error concerning the overruling of its motion for directed verdict is without merit. The party against whom the verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. Billingsley v. BFM Liquor Mgmt., 264 Neb. 56, 645 N.W.2d 791 (2002). If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. Id.

*750 4. AWARD OF ATTORNEY FEES AND COSTS
The award of attorney fees and costs to Jackson was based upon his obtaining a judgment against the Fund. Because we have concluded that the district court committed reversible error in admitting exhibits 17 and 18 into evidence, the jury verdict and subsequent award of attorney fees and costs are vacated. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. Ferer v. Erickson, Sederstrom, 272 Neb. 113, 718 N.W.2d 501 (2006). Thus, we need not address the Fund's arguments concerning attorney fees and costs.

VI. CONCLUSION
The district court erred in admitting exhibits 17 and 18 into evidence. Accordingly, we vacate the jury's verdict and the judgment entered against the Fund. We reverse the order overruling the Fund's motion for new trial and remand the cause to the district court for a new trial.
REVERSED AND VACATED, AND CAUSE REMANDED FOR A NEW TRIAL.