Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/24/2025 09:10 AM CDT

Glen Slater and Anne Slater, appellants, v.
Dolf Ichtertz, M.D., and Nebraska Hand &
Shoulder Institute, P.C., appellees.

___ N.W.3d ___

Filed October 24, 2025.    No. S-23-331.

1. **Judgments: Directed Verdict: Appeal and Error.** Appellate review of a ruling on a motion for directed verdict is de novo on the record.
2. **Trial: Expert Witnesses: Judgments: Appeal and Error: Words and Phrases.** An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and an appellate court reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Trial: Expert Witnesses: Evidence: Appeal and Error.** It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his or her opinion about an issue in question. An appellate court reviews the trial court's conclusions with regard to evidentiary foundation for an abuse of discretion.
4. **Trial: Judges.** A trial judge has broad discretion over the conduct of a trial, and, absent abuse, that discretion should be respected.
5. **Directed Verdict.** In a civil case, a directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.
6. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have

every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

 7. **Directed Verdict: Evidence.** If there is any evidence which will sustain a finding for the party against whom the motion for directed verdict is made, the case may not be decided as a matter of law.

 8. **Directed Verdict: Jurors.** If reasonable jurors could find facts that would allow the nonmoving party to prevail, a directed verdict should not be granted.

 9. **Malpractice: Physicians and Surgeons: Proof: Proximate Cause.** To establish a prima facie case of medical malpractice, a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm.

10. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Generally, expert testimony is required to establish each element in a medical malpractice case.

11. **Malpractice: Physicians and Surgeons.** Neb. Rev. Stat. § 44-2810 (Reissue 2021) defines the general standard of care in medical malpractice cases as the ordinary and reasonable care, skill, and knowledge ordinarily possessed and used under like circumstances by members of the profession engaged in a similar practice in similar localities, and it provides that to determine what constitutes such ordinary and reasonable care, skill, and diligence in a particular case, the test is that which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances.

12. **Malpractice: Physicians and Surgeons: Proximate Cause: Damages.** In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff.

13. **Negligence.** Res ipsa loquitur is an exception to the general rule that negligence cannot be inferred.

14. ____. Res ipsa loquitur is a procedural tool that, if applicable, allows an inference of a defendant's negligence to be submitted to the fact finder, where it may be accepted or rejected. Res ipsa loquitur is best described as a rule of evidence, not a rule of substantive law.

15. **Malpractice: Physicians and Surgeons: Expert Witnesses: Proof.** In a medical malpractice case, the theory of res ipsa loquitur may generally be relied upon in several situations: (1) when the act causing the injury is so palpably negligent that it may be inferred as a matter of law, i.e., leaving foreign objects, sponges, scissors, et cetera, in the body, or amputation of a wrong member; (2) when the general experience and

observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

16. **Negligence: Proof.** There are three elements that must be satisfied for the theory of res ipsa loquitur to apply: (1) The occurrence must be one which would not, in the ordinary course of things, happen in the absence of negligence; (2) the instrumentality which produces the occurrence must be under the exclusive control and management of the alleged wrongdoer; and (3) there must be an absence of explanation by the alleged wrongdoer.

17. ____: ____. When all three elements of res ipsa loquitur have been met and the doctrine is applicable, the essence of the doctrine is that an inference of negligence arises without further proof.

18. **Negligence.** The doctrine of res ipsa loquitur allows an inference of a defendant's negligence to be submitted to the fact finder, where it may be accepted or rejected.

19. **Negligence: Proof.** Res ipsa loquitur allows the inference of the defendant's negligence because the inference is probable and more plausible than any other explanation propounded, and therefore, the plaintiff need not establish the exact manner in which the plaintiff was injured, or the precise act or event which precipitated the plaintiff's injury.

20. **Negligence: Evidence: Juries.** To decide if the doctrine of res ipsa loquitur applies, a court must determine whether evidence exists from which reasonable persons can say that it is more likely than not that the three elements of res ipsa loquitur have been met. If such evidence is presented, then there exists an inference of negligence which presents a question of material fact for the jury.

21. **Courts: Negligence: Proof.** The court should not weigh the evidence to determine whether res ipsa loquitur applies. Instead, the court must determine whether there is sufficient evidence from which reasonable persons could find that it is more likely than not that the three elements of res ipsa loquitur have been proved and that it is therefore more likely than not that there was negligence associated with the event.

22. **Appeal and Error.** An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.

23. **Trial: Expert Witnesses: Proof.** It is the burden of the proponent of expert testimony to establish the necessary foundation for its admission.

24. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Expert testimony concerning the standard of care in a medical malpractice case should not be received if it appears the witness is not in possession of

such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture.

25. **Evidence.** Opinion evidence which is unsupported by appropriate foundation is not admissible.

26. **Trial: Expert Witnesses.** Triers of fact are not required to take opinions of experts as binding upon them, and determining the weight to be given expert testimony is uniquely the province of the fact finder.

27. **Trial: Evidence: Witnesses.** Matters of courtroom management, including the efficient management of evidence and witnesses, are left to the discretion of the trial court.

28. **Witnesses: Good Cause: Proof.** Under Neb. Rev. Stat. § 24-734(5)(a) (Cum. Supp. 2022), it is the moving party's burden to show good cause for permitting a witness to testify by telephonic, videoconference, or similar methods in any civil case.

29. **Trial: Appeal and Error.** An issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal.

Appeal from the District Court for Hall County: Patrick M. Lee, Judge. Reversed and remanded for a new trial.

Robert M. Sullivan, of Sullivan Law, P.C., L.L.O., for appellants.

Mark A. Christensen and Isaiah J. Frohling, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Freudenberg, JJ.

Per Curiam.

In this medical malpractice action, the trial court directed a verdict for the defendants at the close of the plaintiffs' case in chief. On appeal, the plaintiffs assign error to that ruling, arguing that the evidence was sufficient to survive a directed verdict under both a traditional medical malpractice theory and the doctrine of res ipsa loquitur. They also assign error to several of the trial court's evidentiary and procedural rulings.

Because we conclude the directed verdict should not have been granted on this record, we reverse the judgment and

remand the cause for a new trial. Regarding the remaining assignments of error, we exercise our discretion to address those likely to recur on remand.

## I. BACKGROUND

### 1. Surgery

In 2017, Dr. Dolf Ichtertz diagnosed Glen Slater with severe cubital tunnel syndrome, a condition that occurs when the ulnar nerve is compressed or entrapped at the elbow. Ichtertz recommended that Slater undergo a surgical procedure the parties describe as an "endoscopic cubital tunnel release." Slater elected to have the surgical procedure, and Ichtertz performed it.

With Slater under anesthesia, Ichtertz made a small incision in Slater's left arm near his elbow and inserted a hand-held instrument, or "cutting guide," that was designed to slide over the fascia covering the ulnar nerve. It is undisputed that while Ichtertz was attempting to advance the guide proximally along Slater's ulnar nerve to get it into position, he encountered resistance. He described "struggling" with the guide for a few seconds and stated that when he looked through the scope to identify what was causing the resistance, he saw that Slater's ulnar nerve was "bunching up" on the front end of the guide. Ichtertz removed the guide and discovered that a single fascicle of Slater's ulnar nerve had been transected, or "cut in half," but was not displaced. Ichtertz repaired the fascicle using sutures and completed the cubital tunnel release procedure using different instruments.

### 2. Lawsuit

In 2019, Slater and his wife, Anne Slater, filed a medical malpractice action against Ichtertz and his employer, Nebraska Hand & Shoulder Institute, P.C. (collectively Ichtertz), in the district court for Hall County. The operative complaint generally alleged that Ichtertz had negligently performed the cubital tunnel release procedure on Slater and that his negligence

caused permanent injury to Slater's left arm and hand, including severe ulnar neuropathy, weakness, loss of fine motor skills, and disfigurement. The complaint sought a judgment against Ichtertz for special and general damages.

Ichtertz admitted performing surgery on Slater's ulnar nerve, but he specifically denied any negligence and he disputed the cause, nature, and extent of Slater's injuries and damages.

The case was set for a 5-day jury trial in April 2023.

### 3. Pretrial Motions and Rulings

#### (a) Motion to Allow Witness Testimony by Videoconference

Several months before trial, the Slaters filed a motion seeking a blanket order allowing "witnesses to testify via videoconference technology at the upcoming trial in this matter." As authority for the request, the Slaters cited Neb. Rev. Stat. § 24-734(5)(a) and (b) (Cum. Supp. 2022). Ichtertz objected to the motion under § 24-734(5)(c). After an evidentiary hearing, the court overruled the motion. Additional details about the hearing and the court's ruling will be discussed later in the analysis.

#### (b) Ruling on Objections to Trial Deposition

After their motion to allow witness testimony by videoconference was overruled, the Slaters took a video deposition of their out-of-state medical expert, Dr. Robert Wysocki, for use at trial. Wysocki is a board-certified orthopedic surgeon who specializes in hand and upper extremity issues. Wysocki's qualification to testify as an expert in this matter is not challenged.

In an earlier discovery deposition, Wysocki testified that in his opinion, Ichtertz breached the applicable standard of care by using the surgical instrument to apply a significant amount of force directly to the ulnar nerve, resulting in severe ulnar nerve injury. When Wysocki's video deposition was taken for

use at trial, he was asked for his opinion on whether Ichtertz met the standard of care when performing Slater's cubital tunnel release surgery. Before Wysocki could answer, Ichtertz asked to voir dire the witness.

During that voir dire questioning, Wysocki testified that he believed the "technique" used by Ichtertz during Slater's surgery was inappropriate, due to "the degree of force that was imparted" by Ichtertz on Slater's ulnar nerve using the instrument. Ichtertz then asked Wysocki the following series of questions:

> Q Have you in connection with this case reviewed any literature regarding the tensile strength of the ulnar nerve?
>
> A No.
>
> Q Have you conducted any independent study of the tensile strength of an ulnar nerve?
>
> A No.
>
> Q Have you calculated how much force is required to break a single fascicle of an ulnar nerve?
>
> A No.
>
> Q Have you reviewed any literature regarding the degree to which the tensile strength of an ulnar nerve is reduced in a patient with diabetes severe enough to cause diabetic neuropathy?
>
> A No.
>
> . . . .
>
> Q And you didn't calculate the amount of force it would take to break a single fascicle of . . . Slater's ulnar nerve given his diabetic status, did you?
>
> A No.

After this voir dire examination, Ichtertz objected to any further standard of care testimony by Wysocki, arguing that such testimony lacked necessary foundation. During the remainder of Wysocki's video deposition, Ichtertz renewed his foundational objection in response to some, but not all, of Wysocki's testimony.

After Wysocki's video deposition was completed, the transcript was submitted to the district court for pretrial rulings on various objections. Many of Ichtertz' foundational objections were sustained, and the court directed that specific portions of Wysocki's opinion testimony be stricken. Among the stricken testimony was Wysocki's opinion that Ichtertz' conduct

> fell below the standard of care because there was a significant amount of force imparted to the ulnar nerve that then led to severe dysfunction of the ulnar nerve after surgery [and] this falls outside of the standard of care because . . . it's a top priority of a surgeon when they're doing this operation, first and foremost, to attempt to do no harm and preserve the competency of the ulnar nerve.
>
> . . . .
>
> And in this case, there was enough force imparted on the nerve that . . . it was injured, and I think this, if you look at the existing literature, is a very uncommon circumstance and one that should be avoided.

The Slaters filed a motion to reconsider the rulings that struck portions of Wysocki's opinion testimony, which the court overruled. The Slaters redacted Wysocki's video deposition to reflect the court's rulings and made an offer of proof at trial that included the unredacted testimony.

On the second day of trial, Ichtertz made an oral motion, outside the presence of the jury, to strike additional portions of Wysocki's video deposition testimony based on the court's prior rulings. The Slaters objected to that motion on several grounds, including that the request was untimely under the court's progression order. The court granted the motion in part and overruled it in part, and directed that additional portions of Wysocki's testimony be stricken for lack of foundation.

Wysocki's redacted video deposition was played for the jury during the Slaters' case in chief, and relevant details

about that testimony will be provided later in this opinion when discussing whether the evidence was sufficient to survive directed verdict.

### 4. Jury Trial and Directed Verdict

The Slaters presented their case in chief over the course of 3 days. Multiple exhibits were offered and received, including records of the cubital tunnel release surgery and the medical treatment Slater received thereafter to address his ulnar nerve complaints. Wysocki's video deposition was played for the jury, and the Slaters called several witnesses, including Ichtertz, Slater, and Slater's physical therapist. Relevant aspects of this testimony will be detailed later in the analysis.

After the Slaters rested their case in chief, Ichtertz moved for a directed verdict on all claims. Outside the jury's presence, Ichtertz argued that because much of Wysocki's opinion testimony had been stricken for lack of foundation, there was insufficient evidence adduced to establish a prima facie claim of medical malpractice. Ichtertz specifically argued (1) there was insufficient evidence to establish the applicable standard of care, (2) there was no "colorable opinion" that Ichtertz breached the applicable standard, and (3) there was "literally no testimony on the issue of causation from anyone that we have seen testify in this case so far." Ichtertz also argued there had been no evidence adduced to support a derivative claim by Slater's wife.

In opposing the motion, the Slaters argued that the evidence was sufficient to survive a directed verdict under two legal theories. First, they argued the unstricken portions of Wysocki's deposition testimony, along with Ichtertz' trial testimony, provided sufficient evidence to prove the elements of a traditional medical malpractice claim, including evidence of the applicable standard of care, evidence that Ichtertz breached that standard, and evidence that Slater's nerve injuries were caused by the breach. Additionally, they

argued that even if the court believed the evidence of standard of care, breach, and causation was lacking, the evidence was nevertheless sufficient to support an inference of negligence under the theory of res ipsa loquitur. The Slaters did not, however, strenuously oppose dismissal of any derivative claim on behalf of Slater's wife, conceding that the operative complaint had not alleged loss of consortium.

After considering the parties' arguments, the district court ruled from the bench, directing a verdict in favor of Ichtertz on all claims. Addressing the claim of medical malpractice, the court agreed with Ichtertz that "the evidence relating to the standard of care [and breach] was lacking as a matter of law." It also agreed "there was a complete absence of evidence relating to causation from any expert." It therefore concluded the Slaters' evidence was insufficient as a matter of law to establish a prima facie claim of medical negligence.

The district court also found the evidence was insufficient to support an inference of negligence under a res ipsa loquitur theory. It reasoned, in part, that the elements of res ipsa loquitur could not be satisfied because both Wysocki and Ichtertz testified it was possible for an ulnar nerve injury to occur in the absence of negligence. It also concluded that the evidence did not fit into any of the situations under which this court has allowed the res ipsa loquitur doctrine to be used in a medical malpractice case.[1]

Finally, the court concluded that although Slater's wife was named as a plaintiff in the operative complaint, no separate claim had been alleged or proved on her behalf, so it

---

[1] See, *Evans v. Freedom Healthcare*, 311 Neb. 336, 972 N.W.2d 75 (2022) (holding medical malpractice claims may be brought under res ipsa loquitur in three situations: (1) when act causing injury is so palpably negligent that negligence may be inferred as matter of law, (2) when general experience and observation of mankind teaches that result would not be expected without negligence, and (3) when proof by experts in esoteric field creates inference that negligence caused injuries); *Keys v. Guthmann*, 267 Neb. 649, 676 N.W.2d 354 (2004) (same).

directed a verdict in favor of Ichtertz as against Slater's wife. The Slaters did not assign error to this aspect of the directed verdict ruling, and we do not address it further.[2]

In a signed and dated judgment styled as a journal entry, the trial court memorialized its oral rulings on the motion for directed verdict and entered judgment in favor of Ichtertz and against the Slaters on all claims. The Slaters filed this timely appeal, which we moved to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

The Slaters identify nine assignments of error on appeal that we consolidate and restate into four: The district court erred in (1) granting a directed verdict, (2) denying the motion for leave to allow witness testimony by videoconference, (3) striking portions of Wysocki's opinion testimony based on a lack of foundation, and (4) sustaining foundational objections to certain portions of the physical therapist's trial testimony.

## III. STANDARD OF REVIEW

[1] Appellate review of a ruling on a motion for directed verdict is de novo on the record.[3]

[2] An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an

---

[2] See *Konecne v. Abram, LLC*, 319 Neb. 966, ___ N.W.3d ___ (2025) (holding alleged error must be both specifically assigned and specifically argued to be considered by appellate court).

[3] *Khaitov v. Greater Omaha Packing Co.*, 319 Neb. 932, 25 N.W.3d 739 (2025). See *State v. Bruna*, 12 Neb. App. 798, 829, 686 N.W.2d 590, 615 (2004) ("[w]hether a trial court should have granted a motion for directed verdict at the close of the State's case is a question of law, regarding which an appellate court must reach a conclusion independent of the determination reached by the court below"). Accord *132 Ventures v. Active Spine Physical Therapy*, 318 Neb. 64, 13 N.W.3d 441 (2024) (holding appellate review of ruling on motion for judgment notwithstanding verdict is de novo on record).

expert's testimony, and an appellate court reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[4] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[5]

[3] It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his or her opinion about an issue in question.[6] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation for an abuse of discretion.[7]

[4] A trial judge has broad discretion over the conduct of a trial, and, absent abuse, that discretion should be respected.[8]

## IV. ANALYSIS

### 1. Trial Court Erred in Granting Directed Verdict

[5-8] In a civil case, a directed verdict is proper only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[9] We have often explained:

> In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence

---

[4] *Konsul v. Asensio*, 316 Neb. 874, 7 N.W.3d 619 (2024). See, *State v. Lewis*, 319 Neb. 847, 25 N.W.3d 421 (2025); *State v. Woolridge-Jones*, 316 Neb. 500, 5 N.W.3d 426 (2024).

[5] *Konsul, supra* note 4.

[6] *Stukenholtz v. Brown*, 267 Neb. 986, 679 N.W.2d 222 (2004).

[7] *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

[8] *Connelly v. City of Omaha*, 278 Neb. 311, 769 N.W.2d 394 (2009).

[9] See, *Konsul, supra* note 4; *Cohan v. Medical Imaging Consultants*, 297 Neb. 111, 900 N.W.2d 732 (2017), *modified on denial of rehearing* 297 Neb. 568, 902 N.W.2d 98.

submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[10]

It is well settled that if there is "any evidence" which will sustain a finding for the party against whom the motion for directed verdict is made, the case may not be decided as a matter of law.[11] Stated differently, "if reasonable jurors *could* find facts that would allow the nonmoving party to prevail, a directed verdict should not be granted."[12]

With this standard in mind, we focus our de novo review on whether there was any competent evidence adduced at trial that would allow a reasonable jury to find the Slaters proved a medical malpractice claim against Ichtertz. The Slaters argue their evidence was sufficient to survive a directed verdict both under a traditional medical malpractice theory and under the doctrine of res ipsa loquitur. We consider each theory in turn.

(a) Medical Malpractice Theory

[9,10] To establish a prima facie case of medical malpractice, a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of

---

[10] *Bruce Lavalleur, P.C. v. Guarantee Group,* 314 Neb. 698, 704, 992 N.W.2d 736, 741 (2023). Accord *Anderson v. Babbe*, 304 Neb. 186, 933 N.W.2d 813 (2019). See, *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642, 748 N.W.2d 626 (2008); *Jackson v. Brotherhood's Relief & Comp. Fund*, 273 Neb. 1013, 734 N.W.2d 739 (2007); *Billingsley v. BFM Liquor Mgmt.*, 264 Neb. 56, 645 N.W.2d 791 (2002).

[11] *Aon Consulting, supra* note 10, 275 Neb. at 650, 748 N.W.2d at 636. Accord, *Jackson, supra* note 10; *Billingsley, supra* note 10.

[12] *Bruce Lavalleur, P.C., supra* note 10, 314 Neb. at 704, 992 N.W.2d at 741 (emphasis in original).

the plaintiff's harm.[13] Generally, expert testimony is required to establish each of these elements.[14]

In this case, the trial court found that the expert testimony adduced during the Slaters' case in chief was insufficient, as a matter of law, to establish any of the three elements of a medical malpractice claim. After reviewing the record de novo, we cannot agree. In the sections that follow, we summarize the expert testimony adduced regarding standard of care, breach of that standard, and causation. In doing so, we assume the truth of all competent evidence adduced on behalf of the Slaters, give them the benefit of every reasonable inference from that evidence, and resolve every controverted fact in their favor.

*(i) Standard of Care*

[11] Neb. Rev. Stat. § 44-2810 (Reissue 2021) defines the general standard of care in medical malpractice cases as "the ordinary and reasonable care, skill, and knowledge ordinarily possessed and used under like circumstances by members of his profession engaged in a similar practice in his or in similar localities" and provides that to determine what constitutes such ordinary and reasonable care, skill, and diligence in a particular case, the test is that "which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances."

Our de novo review of the record reveals competent medical evidence regarding the applicable standard of care in the testimony of both Wysocki and Ichtertz. For example, in

---

[13] *Konsul, supra* note 4; *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023).

[14] *Evans, supra* note 1, 311 Neb. at 345, 972 N.W.2d at 83 ("[i]n medical malpractice cases, expert testimony by a medical professional is normally required to establish the standard of care and causation under the circumstances"). See *Konsul, supra* note 4.

the unredacted portions of Wysocki's video deposition, he testified about the applicable standard of care when performing endoscopic cubital tunnel release surgery, stating that "I believe that the standard of care . . . is to not impart a structural injury to the ulnar nerve where you cause marked dysfunction of the ulnar nerve due to your own actions, your own instrumentation and your own handling of the nerve during the procedure." Elaborating on this standard, Wysocki testified that when performing surgeries around the ulnar nerve, the goal, "first and foremost," is "always keeping [the nerve] protected from iatrogenic injury, meaning being injured during the procedure itself. . . . [N]o matter what you're doing around the ulnar nerve, keeping it protected from iatrogenic injury during surgery is critical." Wysocki explained that "since the surgeon knows that [the] first and foremost goal is don't injure the nerve, it means that the surgeon is very cautious on the amount of pressure they're applying and the feel of the process while they're performing the surgery."

When asked, "[H]ow much pressure is appropriate during an endoscopic cubital tunnel release?" Wysocki replied, "A light amount based on feel." He testified that when placing an instrument during an endoscopic-assisted cubital tunnel release surgery, it would be "within the standard of care" to "apply gentle pressure to place" the instrument, but it "would not be appropriate to be forceful and aggressive to the point you cause a severe nerve injury."

Wysocki testified that to determine the applicable standard of care for endoscopic cubital tunnel release surgeries in Nebraska, he relied on his own training and experience, reviewed all of Slater's medical records and diagnostic studies, reviewed the pertinent literature and peer review journals, reviewed the expert depositions and reports in this case, and spoke with medical professionals in Nebraska who specialize in the hand and upper extremity.

When Ichtertz was called to testify in the Slaters' case in chief, he too testified about the applicable standard of care.

He was asked: "What was the medical standard of care for a cubital tunnel release in central Nebraska in August 2017?" He replied, "The standard of care is to go in and carefully release the ulnar nerve." Ichtertz agreed that one of the "most significant" things when performing a cubital tunnel release is to avoid damaging or harming the ulnar nerve. When asked how a surgeon knows "how hard to push in an endoscopic cubital tunnel release procedure," Ichtertz responded this was something learned "by experience." Finally, Ichtertz was asked whether a different standard of care applied to performing an endoscopic cubital tunnel release on patients with diabetes, and he replied, "Not that I am aware of. Should be the same."

This trial testimony from both Wysocki and Ichtertz, which must be accepted as true given the stage of the proceedings, was sufficient to allow a reasonable jury to conclude the Slaters proved that when performing an endoscopic cubital tunnel release surgery, the applicable standard of care requires handling the surgical instruments in a way that protects the ulnar nerve from iatrogenic injury, being cautious about the amount of pressure being applied when positioning the instruments, using a gentle or light amount of pressure based on feel, and avoiding the use of forceful or aggressive pressure that could injure the ulnar nerve. On this record, the trial court erred in concluding that the Slaters adduced no competent evidence of the applicable standard of care.

### (ii) Breach

In the unredacted portions of Wysocki's video deposition, he testified about the ways in which Ichtertz breached the applicable standard of care. When asked what Ichtertz did "incorrectly" during the endoscopic cubital tunnel release procedure, Wysocki replied, "[I]t appear[s] that he imparted an amount of force directly to the ulnar nerve using the surgical instrumentation that caused a severe ulnar nerve injury." Similarly, when asked if there was anything "inappropriate"

in the technique Ichtertz used, Wysocki replied that it was inappropriate for Ichtertz to impart a "degree of force . . . that damaged the ulnar nerve."

Ichtertz' own trial testimony also provided evidence to support a finding that he breached the applicable standard of care regarding the amount of pressure he applied to the ulnar nerve when attempting to position the guide. At one point in the questioning, the following exchange occurred:

Q Were you trying to overcome the resistance that the fascia was providing?

A Well, I am sure I was to some degree.

Q In doing that, do you think you pushed too hard to overcome that resistance?

A Given the outcome of this case or the surgery, I will say, yes, but at the time, I was not applying, you know, much force. It's a gentle force.

Q Is your testimony — in hindsight, now that you know what you know, do you agree that you were pushing too hard at that time?

A Most likely.

Q Was it right to push too hard?

A These are judgment calls. I believe [that] too hard is a post facto thing. . . . Very gentle use of the tools. At the same time, it's working on a person whose nerves aren't in real good shape. You know, it's a judgment thing. In this case, it didn't quite work out the way it should have.

When the Slaters' counsel pointed out that Ichtertz testified he was putting "delicate pressure" on the instrument but that he also testified that he "pushed too hard," Ichtertz replied, "I am making a supposition [I] must have pushed too hard. Otherwise, I would not have anticipated any damage at all . . . ." When asked, "Do you know how much pressure is too much pressure on the ulnar nerve?" Ichtertz replied, "No, I don't." He was then asked, "Has there ever been any testing

done on the human ulnar nerve to determine how much pressure it can take?" He answered, "No."

On cross-examination, Ichtertz agreed that, in retrospect, "the amount of pressure placed on the nerve was more than it could tolerate," but he added that by saying he "push[ed] too hard," he did not mean that his technique breached the standard of care. Indeed, it was Ichtertz' testimony that he used only gentle pressure when positioning the guide and therefore met the standard of care.

We acknowledge that the evidence adduced during the Slaters' case in chief was controverted as it regards breaching the applicable standard of care. But courts considering motions for directed verdicts are required to treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed, and in doing so, courts must resolve all controverted facts in favor of that party and give them the benefit of every inference reasonably deduced from the evidence.[15] Applying that standard to the evidence adduced during the Slaters' case in chief, we conclude the medical testimony from both Wysocki and Ichtertz was sufficient to allow a reasonable jury to find that Ichtertz breached the applicable standard of care by applying an excessive amount of force to the ulnar nerve while positioning the instrument. To the extent the district court concluded there was no evidence of breach, it erred.

### (iii) Causation

[12] In the medical malpractice context, the element of proximate causation requires proof that "the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff."[16] In the unredacted portions of Wysocki's video deposition, he testified that Slater's ulnar nerve injury was caused by Ichtertz' applying too much force while positioning the guide during the endoscopic cubital

---

[15] See *Bruce Lavalleur, P.C., supra* note 10; *Anderson, supra* note 10.

[16] *Cohan, supra* note 9, 297 Neb. at 127, 900 N.W.2d at 743.

tunnel release procedure. Wysocki was asked directly: "Was . . . Slater's ulnar nerve injured in this procedure?" Wysocki replied, "Yes, it was." Wysocki testified that after the surgery, Slater had "severe dysfunction" of his ulnar nerve that "he did not have prior to his surgery," and he testified that "the cause of that problem was the intraoperative effects that . . . Ichtertz supplied to the nerve."

In Ichtertz' trial testimony, he made several admissions regarding causation. He was asked, "You take full responsibility for the injury to . . . Slater's ulnar nerve, don't you?" He answered, "Yes, I do." And when asked if he thought that Slater's ulnar nerve was severed during the "few seconds" that Ichtertz encountered resistance and "struggled" to advance the cutting guide, Ichtertz said, "Yes, I think so." In followup questioning, he was asked, "Is that also when any other injuries to . . . Slater's ulnar nerve would have occurred from the device that you were using?" He replied, "Yes." Ichtertz was asked, "Do you believe that it was the instrument that caused the cut to the fascicle when you were pushing against the nerve?" He answered, "Ultimately, yes." He was then asked, "The only way that instrument can put pressure on the nerve is if your hand is providing 100 percent of the pressure, correct?" He stated, "That's correct."

Later in Ichtertz' testimony, the following evidence was adduced:

Q Was it obvious to you during the procedure that . . . Slater's nerve was going to suffer a little bit of a contusion?

A Well, I felt it probably would, yes.

Q Is contusion another word for bruise?

A Yes, it is.

Q What made you feel that it was going to suffer a little bit of a contusion or bruise?

A Because when I realized that the instrument had been pushing on the nerve and that a fascic[le] had ruptured or had been cut by the end of the instrument,

it just makes sense that the nerve was going to have a problem from that.

According to Ichtertz, the injury to Slater's ulnar nerve resulted in "two kinds of symptoms, sensory and motor." Ichtertz agreed that if the only injury to Slater's ulnar nerve had been a cut fascicle, he "would expect a very limited sensory or very limited motor problem." But since Slater had both sensory and motor symptoms relating to his ulnar nerve, it was "fair to expect that there was an injury to more than one fascicle in . . . Slater's nerve." Indeed, Ichtertz testified that after the surgery, he was "more concerned about the pressure that had been applied to the nerve when it got in front of the guide as opposed to a transected fascicle," because pressure on the nerve "would potentially encompass a lot more nerve fibers in the area." Finally, Ichtertz agreed that "the injury to . . . Slater's nerve has caused palsy, wasting, numbness, [and] tingling."

Accepting this evidence as true, resolving every controverted fact in the Slaters' favor, and giving them the benefit of all reasonable inferences, we conclude the Slaters adduced sufficient evidence to allow a reasonable jury to find that causation was established. On this record, the district court erred in concluding "there was a complete absence of evidence relating to causation from any expert."

We acknowledge it is possible that the district court was listening for causation testimony couched in the familiar language of "reasonable medical certainty" and that, hearing no such language, the court agreed with Ichtertz that no competent causation testimony had been adduced. But expert medical testimony on causation need not be couched in the magic words of "'reasonable medical certainty'" or "'reasonable probability.'"[17]

---

[17] See *Carson, supra* note 13, 314 Neb. at 163, 989 N.W.2d at 418. Accord *Paulsen v. State*, 249 Neb. 112, 121, 541 N.W.2d 636, 643 (1996) (noting sufficiency of expert opinions must be "judged in view of the entirety of the expert's opinion and is not validated or invalidated solely on the basis of the presence or lack of the magic words 'reasonable medical certainty'").

Instead, such testimony must be sufficient, when examined in its entirety, to establish the crucial causal link between the plaintiff's injuries and the defendant's negligence.[18] Medical testimony that is "couched in terms of 'possibility' is insufficient to support a causal relationship."[19] But when medical testimony regarding causation is "given in terms that express a probability,"[20] it is sufficiently definite. Our cases discussing the sufficiency of expert opinions in medical malpractice cases demonstrate that equivocal words like "could," "may," or "possibly" generally lack the definiteness required to prove causation.[21] But the causation testimony quoted above was not couched in equivocal terms.

Although the causation testimony from Wysocki and Ichtertz did not expressly reference "reasonable medical probability," it was nevertheless couched in terms that were sufficiently definite. Neither physician testified that it was merely "possible" that Slater's ulnar nerve injury was caused by the amount of pressure exerted during the endoscopic-assisted

---

[18] *Carson, supra* note 13. See, also, *Morton v. Hunt Transp.*, 240 Neb. 63, 66, 480 N.W.2d 217, 220 (1992) (noting sufficiency of medical expert's causation opinion "'is judged in the context of the expert's entire statement'").

[19] *Steineke v. Share Health Plan of Neb.*, 246 Neb. 374, 379, 518 N.W.2d 904, 907 (1994).

[20] *Rankin v. Stetson*, 275 Neb. 775, 787, 749 N.W.2d 460, 469 (2008).

[21] Compare *Carson, supra* note 13, 314 Neb. at 164, 989 N.W.2d at 419 (finding expert medical testimony that "'there *could* have been a significantly bad outcome'" from puncture of amniotic sac was insufficient to support causation because testimony used "language of possibility, not probability"), with *Rankin, supra* note 20 (finding expert medical testimony that early surgical decompression to relieve spinal cord pressure would more likely than not have led to fewer neurological deficits was sufficient to establish causation). See, also, *Miner v. Robertson Home Furnishing*, 239 Neb. 525, 476 N.W.2d 854 (1991) (holding medical testimony expressed in terms of "possibly" was not sufficient to prove causation but testimony couched in terms of "probability" was sufficient).

cubital tunnel release procedure. Instead, both physicians testified that Slater's ulnar nerve injury was caused when pressure was applied to the ulnar nerve while Ichtertz was positioning the guide instrument during the endoscopic cubital tunnel release procedure.

### (iv) Summary of Medical Malpractice Theory

Our de novo review reveals that the Slaters adduced sufficient evidence during their case in chief to establish a prima facie case of medical malpractice. Because this evidence could allow reasonable jurors to find facts establishing the standard of care, breach of that standard, and causation, it was error to grant a directed verdict in favor of Ichtertz on the Slaters' medical malpractice theory.

### (b) Res Ipsa Loquitur Theory

The Slaters contend they "had two evidentiary avenues to prove medical malpractice, and res ipsa loquitur was one of them."[22] They argue that based on the evidence adduced during their case in chief and our reasoning in *Evans v. Freedom Healthcare*,[23] their malpractice claim against Ichtertz should have survived a directed verdict based not only on evidence that Slater's ulnar nerve injury was caused by specific acts of negligence, but also based on evidence that would permit an inference of negligence under the doctrine of res ipsa loquitur.

[13,14] Res ipsa loquitur is an exception to the general rule that negligence cannot be inferred.[24] More specifically, it is a procedural tool that, if applicable, allows an inference of a defendant's negligence to be submitted to the fact finder, where

---

[22] Brief for appellants at 30.

[23] *Evans, supra* note 1.

[24] See *McLaughlin Freight Lines v. Gentrup*, 281 Neb. 725, 798 N.W.2d 386 (2011). See, also, *Benedict v. Eppley Hotel Co.*, 161 Neb. 280, 73 N.W.2d 228 (1955).

it may be accepted or rejected.[25] We have described res ipsa loquitur as a rule of evidence, not a rule of substantive law.[26]

[15] Our cases describe several situations under which the theory of res ipsa loquitur may generally be relied upon in a medical malpractice case: (1) when the act causing the injury is so palpably negligent that it may be inferred as a matter of law, i.e., leaving foreign objects, sponges, scissors, et cetera, in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.[27]

[16-19] When a medical malpractice case falls into one of the described situations, there are three elements that must be satisfied for the theory of res ipsa loquitur to apply: (1) the occurrence must be one which would not, in the ordinary course of things, happen in the absence of negligence; (2) the instrumentality which produces the occurrence must be under the exclusive control and management of the alleged wrongdoer; and (3) there must be an absence of explanation by the alleged wrongdoer.[28] When these three elements have been met and the doctrine is applicable, the essence of the

---

[25] *Evans, supra* note 1. Accord *Anderson v. Service Merchandise Co.*, 240 Neb. 873, 881, 485 N.W.2d 170, 176 (1992) (noting when res ipsa loquitur applies, evidence is sufficient to go to jury, but "'[t]he inference of negligence to be drawn from the circumstances is left to the jury'" and jurors "'are permitted, but not compelled to find it'").

[26] *Evans, supra* note 1.

[27] *Id.*; *Keys, supra* note 1.

[28] *Evans, supra* note 1. Accord *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998) (to trigger application of res ipsa loquitur in medical malpractice case, instrumentality that caused injury must be under exclusive control of defendant, injury must be one that would not ordinarily occur absent negligence, and defendant cannot have explanation that precludes liability).

doctrine is that an inference of negligence arises without further proof.[29] In other words, the doctrine allows an inference of a defendant's negligence to be submitted to the fact finder, where it may be accepted or rejected.[30] Res ipsa loquitur allows the inference of the defendant's negligence because the inference "'is probable and more plausible than any other explanation propounded,'" and therefore, "'[t]he plaintiff need not establish the exact manner in which he was injured, or the precise act or event which precipitated his injury.'"[31]

[20,21] To decide if the doctrine of res ipsa loquitur applies, "a court must determine whether evidence exists from which reasonable persons can say that it is more likely than not that the three elements of res ipsa loquitur have been met."[32] If such evidence is presented, then there exists an inference of negligence which presents a question of material fact for the jury.[33] We have cautioned that this judicial inquiry does not involve weighing the evidence:

> The court should not weigh the evidence to determine whether res ipsa loquitur applies. Instead, the court must determine whether there is sufficient evidence from which reasonable persons could find that it is more likely than not that the three elements of res ipsa loquitur have been proved and that it is therefore more likely than not that there was negligence associated with the event.[34]

In the sections that follow, we review the record de novo to determine whether the evidence adduced during the Slaters' case in chief was sufficient to allow a reasonable jury to find by a preponderance of the evidence that all three

---

[29] *Evans, supra* note 1.

[30] *Id.*

[31] *Swierczek v. Lynch*, 237 Neb. 469, 477, 466 N.W.2d 512, 517 (1991).

[32] *McLaughlin Freight Lines, supra* note 24, 281 Neb. at 728-29, 798 N.W.2d at 389-90.

[33] See *McLaughlin Freight Lines, supra* note 24.

[34] *Id.* at 729, 798 N.W.2d at 390.

elements of res ipsa loquitur had been proved. We consider each element in turn, and ultimately conclude the evidence, at least as it existed at the close of the Slaters' case in chief, was sufficient to survive a directed verdict.

Before doing so, however, we briefly note the district court appears to have concluded that this medical malpractice case does not fall within any of the recognized situations where plaintiffs have been allowed to proceed under a res ipsa loquitur theory. We respectfully disagree. Because this record contains medical testimony on each of the three res ipsa elements, the case falls squarely within the third category of medical malpractice cases, "when proof by experts in an esoteric field creates an inference that negligence caused the injuries."[35]

### (i) Injury Would Not Ordinarily Occur Absent Negligence

We focus first on whether there was sufficient medical testimony to prove that the injury to Slater's ulnar nerve was an occurrence that would not, in the ordinary course of things, happen in the absence of negligence. We begin by summarizing the evidence describing the nature of the injuries to Slater's ulnar nerve, after which we summarize the evidence about whether such injuries are the type that ordinarily occur in cubital tunnel release surgeries in the absence of negligence.

The medical testimony generally described the injuries to Slater's ulnar nerve to include a complete transection of a single fascicle, as well as bruising and stretching of the nerve when it got "bunched up" on the blunt end of the cutting guide. Regarding transection of the nerve, the following medical testimony was adduced from Wysocki:

> Q Based on your training, experience, and the research you have done in this case, how many times have you

---

[35] *Evans, supra* note 1, 311 Neb. at 347, 972 N.W.2d at 84. See *Keys, supra* note 1.

come across a case in which a patient has experienced a partially or fully transected ulnar nerve during a cubital tunnel release procedure?

A Zero outside of this one.

. . . .

Q Based on your knowledge, how common or rare is a transection, partial or full, of an ulnar nerve in an endoscopic cubital tunnel release procedure?

. . . .

A Exceedingly rare.

Wysocki was then asked whether the transection of Slater's ulnar nerve was "preventable in this case," and he testified that he was "[c]ertain" the injury could have been prevented. The jury was not allowed to hear Wysocki's explanation for how the injury could have been prevented, because it was part of the testimony stricken by the trial court for lack of foundation. But a reasonable inference from the unredacted portions of Wysocki's testimony is that Slater's ulnar nerve would not have been transected, or cut, by the blunt end of the guide instrument if Ichtertz had applied only gentle pressure, rather than excessive pressure, when positioning the instrument.

On cross-examination, Wysocki was asked, "So can you have an ulnar nerve laceration without negligence on the part of the surgeon?" and Wysocki answered, "I think in very rare circumstances, you can have an ulnar nerve laceration without negligence." On redirect, Wysocki was asked whether any of those circumstances were present in Slater's case, and he replied, "No, they were not." Wysocki was asked to give an example of a circumstance under which an ulnar nerve might be lacerated during an endoscopic cubital tunnel release without the surgeon being negligent. He said a principal example of a nerve transection that would not fall outside the standard of care is where the ulnar nerve had been operated on previously and was "encased in scar tissue" such that when attempting to dissect the nerve, the surgeon cannot

"discern what is nerve [and] what is not" because "everything looks kind of the same." There was no evidence that Slater's ulnar nerve had been operated on previously, that it was encased in scar tissue, or that it was otherwise difficult to discern from the surrounding fascia or tissue.

Ichtertz also testified about the prevalence of ulnar nerve transections during cubital tunnel surgery. When asked, "How often does the ulnar nerve get cut into or cut completely through during a cubital tunnel release surgery?" Ichtertz replied, "I don't know. This is the first time that I had an injury like this occur. . . . I have done over 2,000 cubital tunnel surgeries. It's not very common." He was later asked, "If a surgeon pushed to the point of severing a fascicle in the ulnar nerve, would that be unusual?" and he replied, "It's an unusual occurrence."

There was also medical testimony from both Wysocki and Ichtertz about the prevalence of other types of injury to the ulnar nerve during endoscopic cubital tunnel release surgeries, such as the nerve being bruised and stretched. Wysocki agreed with the general proposition that "injury to the ulnar nerve is a known complication of endoscopic cubital tunnel surgery," but he added that it is "extremely rare." And when Ichtertz was asked what "percentage of cubital tunnel release surgeries have a result where the nerve is injured in the surgery," he replied, "[I]t's not common. Probably 1 in 1,000 in the United States." Ichtertz generally agreed that injury to the ulnar nerve is a "very rare" complication, adding that of all the cubital tunnel surgeries he had performed, "I haven't had this before."

Our de novo review persuades us that the medical testimony from Wysocki and Ichtertz was sufficient, accepted as true and giving the Slaters all reasonable inferences therefrom, to allow a reasonable jury to find that Slater's ulnar nerve injury was the type of occurrence that would not, in the ordinary course of things, happen in the absence of negligence.

### (ii) Instrumentality Which Produced Occurrence
### Was Under Ichtertz' Exclusive Control

In this case, the instrumentality that produced the occurrence was the cutting guide that Ichtertz used to perform the cubital tunnel release, and the evidence was undisputed that the instrument was under the exclusive control and management of Ichtertz throughout the procedure. Ichtertz was responsible for inserting the instrument and guiding the instrument, and he alone was responsible for the amount of pressure exerted on the instrument during Slater's cubital tunnel release surgery. This evidence was sufficient to satisfy the second element of res ipsa loquitur, and Ichtertz does not contend otherwise.

### (iii) Absence of Explanation
### by Alleged Wrongdoer

We turn now to the third element of res ipsa loquitur, which requires an absence of explanation by the alleged wrongdoer. During the Slaters' case in chief, Ichtertz testified that he believed the injuries to Slater's ulnar nerve occurred when he encountered "resistance" while positioning the cutting guide proximally, and when he inserted the scope to see what was causing the resistance, he discovered the ulnar nerve was "bunched up" on the front of the cutting guide. But when Ichtertz was asked what might have caused that to occur, he was unsure.

He was asked whether he "pushed too hard" getting the instrument into position, and he replied, "I am not sure that I did. I'm pushing and the nerve somehow ended up getting in front of the end of the instrument." He also testified, "[T]he nerve wasn't supposed to be there. The guide is supposed to be totally protecting, keeping it away." But Ichtertz did not claim that any sort of malfunction or defect with the guide instrument was responsible for the nerve injury. Instead, it was Ichtertz' testimony that for "unclear" reasons, Slater's "ulnar

nerve seemed to get hooked up on the [guide] proximally after having no problem using it distally."

At one point in his testimony, Ichtertz suggested the ulnar nerve may have gotten bunched up on the end of the instrument, "due to some sort of subtle anatomic variation with the ulnar nerve kinking around the end of the guide." But when he was asked whether this was due to "the floppiness of the nerve," he replied, "I am not really certain. It started catching." It was Ichtertz' testimony that "there had to be something catching [but] I don't know what it was."

When Ichtertz was asked whether the instrument may have gone "through the fascia and come into contact with the nerve," he replied, "I don't know what exactly was going on there," adding "I don't think that's the issue." He explained that when he looked into the scope, the fascia was still between the guide and the ulnar nerve.

Summarized, it was Ichtertz' testimony that while he was positioning the guide, Slater's ulnar nerve "just seemed to get drawn up," "hooked up," or "bunched up" on the front of the guide, but he offered no plausible explanation as to how or why that occurred. On this record, a reasonable jury could find that Ichtertz failed to offer an explanation for the ulnar nerve injury.

### (iv) Summary of Res Ipsa Theory

Because we conclude the Slaters adduced sufficient evidence to allow a reasonable jury to find that all three elements of res ipsa loquitur were met, it was error for the district court to direct a verdict on that theory as a matter of law at the close of the Slaters' case in chief. We must therefore reverse the judgment in favor of Ichtertz and remand the cause to the district court for a new trial.

### 2. Issues Likely to Recur on Remand

[22] Although our reversal of the directed verdict effectively resolves this appeal, an appellate court may, at its discretion,

discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.[36] In this appeal, we exercise our discretion to discuss the remaining assignments of error that challenge several of the trial court's evidentiary rulings, as well as its procedural ruling denying the Slaters' motion to permit witness testimony by videoconference, as it appears these issues are likely to recur during retrial.

(a) Foundational Objections
to Wysocki Opinion

As stated, the trial court sustained many of Ichtertz' foundational objections made during the video deposition of Wysocki and ordered the testimony stricken. The written order ruling on these objections did not contain the court's reasoning, but the Slaters contend on appeal that the court's rulings were premised on Wysocki's answers to the voir dire questioning focused on the "tensile strength" of the ulnar nerve and how much force it can withstand without breaking. The Slaters describe this line of questioning as a "red herring[],"[37] and they argue that Wysocki's answers did not demonstrate a lack of foundational knowledge to support his opinion that the transection injury to Slater's ulnar nerve occurred because Ichtertz applied too much force.

Ichtertz disagrees, and he argues that the foundational objections were properly sustained. He characterizes Wysocki's opinions as being based on the "bald assertion that an injury like that sustained by . . . Slater cannot occur unless too much force is used."[38] And we understand Ichtertz to argue that whether Wysocki's opinions were offered to support a traditional medical malpractice theory, or to support an inference

---

[36] *Brush & Co. v. W. O. Zangger & Son*, 314 Neb. 509, 991 N.W.2d 294 (2023).

[37] Brief for appellants at 16.

[38] Brief for appellee at 24.

of negligence under the theory of res ipsa loquitur, the opinions lacked necessary foundation because Wysocki did not know "[w]hat amount of force overcomes the tensile strength of an ulnar nerve" or "[w]hat amount of force would impart the degree of injury sustained by . . . Slater's ulnar nerve."[39] Because Ichtertz has not challenged the scientific methodology or reasoning employed by Wysocki under *Schafersman v. Agland Coop*,[40] we confine our analysis to whether the trial court properly sustained the foundational objections to Wysocki's opinions based on a lack of sufficient knowledge regarding the tensile strength of the ulnar nerve.

[23-25] It is the burden of the proponent of expert testimony to establish the necessary foundation for its admission.[41] Expert testimony concerning the standard of care in a medical malpractice case should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture.[42] Opinion evidence which is unsupported by appropriate foundation is not admissible.[43]

We are not persuaded by Ichtertz' argument that Wysocki's response to the questions about the "tensile strength" of the ulnar nerve demonstrated a lack of necessary foundation for his opinions. Ichtertz' foundational argument appears to be premised on the assertion that there is some objective or scientific way to measure the amount of pressure a surgeon manually exerts when positioning the hand-held guide during an endoscopic cubital tunnel release. But the record on appeal does not support such an argument.

Both Wysocki and Ichtertz testified that when positioning the guide in an endoscopic cubital tunnel release

---

[39] *Id*. at 27.

[40] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[41] *Konsul, supra* note 4.

[42] *Id*.

[43] *Jackson, supra* note 10.

procedure, the surgeon should use an amount of pressure described interchangeably as "light," "delicate," or "gentle." Both doctors were asked how a surgeon knows how much pressure to use; Wysocki said it is "based on feel," and Ichtertz said it is something learned "by experience." Both denied knowledge of any scientific studies testing the tensile strength of an ulnar nerve to determine how much pressure it could withstand before breaking, and no such studies were offered into evidence at trial. But even assuming such studies exist, Ichtertz does not contend that scientific data measuring tensile strength is widely known or accepted in the relevant medical community, nor does he suggest that surgeons in the relevant medical community rely on tensile strength studies to decide how much pressure to use when manually positioning surgical instruments during a cubital tunnel release procedure.

[26] Triers of fact are not required to take opinions of experts as binding upon them, and determining the weight to be given expert testimony is uniquely the province of the fact finder.[44] Although Wysocki's answers to questions about tensile strength studies may affect the weight a jury gives to his opinions, his answers did not demonstrate a lack of necessary foundation for his opinions. On this record, we conclude it was an abuse of discretion to sustain the foundational objections to Wysocki's opinions based on his admitted unfamiliarity with scientific studies measuring tensile strength.

(b) Objections to Physical Therapist Opinion

At trial, the Slaters called physical therapist Sean Vonderfecht to testify about the results of a functional capacity evaluation that he performed on Slater's left upper extremity. Vonderfecht also intended to offer his opinion that Slater had a 48-percent impairment to the left upper extremity, due to sensation

---

[44] *SID No. 596 v. THG Development*, 315 Neb. 926, 2 N.W.3d 602 (2024).

and motor loss related to his ulnar nerve injury. But before Vonderfecht offered his opinion on Slater's impairment rating, Ichtertz' counsel was permitted to voir dire the witness.

During the voir dire examination, Vonderfecht testified that he calculated the impairment rating by using data from the functional capacity evaluation that he performed and by referencing guidelines contained in a publication of the American Medical Association. Vonderfecht agreed that, according to that publication, permanent impairment evaluations must be "performed by a licensed physician" and that "a medical evaluation is the basis for the determination of permanent impairment of the upper extremities." Vonderfecht also admitted that, according to the publication, he was "not qualified to perform an impairment rating" or to conduct a "medical evaluation" because he was a physical therapist and not a licensed physician.

After this line of questioning, Ichtertz objected to Vonderfecht's impairment rating opinion on the grounds that it lacked foundation and that Vonderfecht was not sufficiently qualified to testify as an expert on the issue under Neb. Rev. Stat. § 27-702 (Reissue 2016). The court sustained the objection on both grounds. Vonderfecht was thereafter permitted to testify as an expert regarding the results of the functional capacity evaluation he performed but was not permitted to testify about any impairment rating.

On appeal, the Slaters contend this was an abuse of discretion. They argue broadly that physical therapists are regularly allowed to offer expert opinions based on their knowledge, skill, experience, and training, and they cite *McDonald v. Miller*[45] as an example of this. In that case, we held that a physical therapist was qualified under § 27-702 to offer an expert opinion that the plaintiff would aggravate her injuries if she sat for an extended period of time. But the Slaters do not explain how *McDonald* has any relevance here, particu-

---

[45] *McDonald v. Miller*, 246 Neb. 144, 518 N.W.2d 80 (1994).

larly since Vonderfecht expressly admitted that, as a physical therapist, he was *not* qualified to offer an opinion on Slater's impairment rating according to the publication on which he relied.

Because Vonderfecht admitted that he was not qualified to testify about permanent impairment ratings, we see no abuse of discretion in the court's decision to sustain the objection to Vonderfecht's opinion on that basis. Given the limitations imposed by the evidence, this record does not afford a meaningful opportunity to address the circumstances, if any, under which a physical therapist might be qualified to offer an opinion on a permanent impairment rating, and we leave that issue for another day.

### (c) Motion to Allow Witness Testimony by Videoconference Under § 24-734(5)

As noted, the Slaters filed a pretrial motion broadly asking that trial witnesses be allowed to testify by videoconference pursuant to § 24-734(5). Subsection (5) of § 24-734 was adopted by the Legislature in 2020[46] and provides in relevant part:

(5)(a) Unless an objection under subdivision (5)(c) of this section is sustained, in any civil case, a judge shall, for good cause shown, permit any witness who is to be examined by oral examination to appear by telephonic, videoconferencing, or similar methods.

(b) . . . A court may find that there is good cause to allow the testimony of a witness to be taken by telephonic, videoconferencing[,] or similar methods if:

(i) The witness is otherwise unavailable to appear because of age, infirmity, or illness;

(ii) The personal appearance of the witness cannot be secured by subpoena or other reasonable means;

---

[46] See 2020 Neb. Laws, L.B. 912.

(iii) A personal appearance would be an undue burden or expense to a party or witness; or

(iv) There are any other circumstances that constitute good cause for allowing the testimony of the witness to be taken by telephonic, videoconferencing, or similar methods.

(c) A party may object to examination by telephonic, videoconferencing, or similar methods under subdivision (5)(a) of this section on grounds of unreliability or unfairness. The objecting party has the burden of proving unreliability or unfairness by a preponderance of the evidence.

The Slaters' motion under § 24-734(5) did not identify any specific witness or witnesses they wanted to testify by videoconference; instead, during the hearing, they broadly asked the court to permit any of the parties' witnesses to testify by videoconference. When the court asked whether § 24-734(5) required more specificity, the Slaters asked the court to permit all "out-of-state witnesses" to testify by videoconference. The Slaters offered no evidence to support a good cause finding, but they argued that allowing out-of-state witnesses to testify by videoconference would give both parties more flexibility, particularly with respect to their expert witnesses, and would reduce the time and expense of litigation.

Ichtertz objected to allowing any witness testimony by videoconference, relying primarily on the objection provision in § 24-734(5)(c). In support of that objection, Ichtertz offered the affidavit of his attorney, who expressed a preference for in-person testimony and described technological difficulties he encountered in the past when appearing by videoconference for court hearings in Hall County. Ichtertz' counsel argued that it was "less than ideal to have a witness testify remotely" and that it made impeachment and exhibit management more

difficult. Counsel also argued the Slaters had not shown good cause to allow their witnesses to testify by videoconference, noting there was sufficient time before trial to take video depositions of any out-of-state medical experts.

The district court sustained Ichtertz' objection and overruled the Slaters' motion, giving three reasons for its decision under § 24-734(5). First, it found the motion lacked the specificity required by the statute and instead sought "blanket approval for any witness, from either party, to appear by videoconferencing." Second, it found the Slaters had not offered any evidence to support a good cause finding under the statute. And finally, the court found that Ichtertz satisfied his burden of proving unfairness under § 24-734(5)(c).

As an alternative statutory basis for its ruling, the court referenced Neb. Rev. Stat. § 24-303(2) (Cum. Supp. 2022), which governs when, where, and how a district court may conduct evidentiary and nonevidentiary hearings telephonically, by videoconference, or by use of similar equipment. Section 24-303(2) states, in part, that "[s]uch hearings shall not include trials before a jury." Here, the trial court cited § 24-303(2) for the general proposition that jury trials may not be "heard by videoconferencing."

[27] On appeal, the Slaters assign and argue that the trial court erred in overruling their motion to allow witness testimony by videoconference. Matters of courtroom management, including the efficient management of evidence and witnesses, are left to the discretion of the trial court,[47] and thus are reviewed by an appellate court for an abuse of discretion.

---

[47] See *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023) (finding no abuse of discretion in trial court's decision to conduct hearing by telephone).

### (i) Slaters Failed to Show Good
### Cause Under § 24-734(5)

[28] Under § 24-734(5)(a), it is the moving party's burden to show good cause for permitting "any witness" to testify by telephonic, videoconference, or similar methods in any civil case. The Slaters' motion did not identify any particular witness, and instead, it requested a blanket order permitting all trial witnesses to testify remotely at the parties' discretion. During the hearing, the Slaters narrowed their request to all "out-of-state witnesses," but even if this could be considered sufficiently specific under § 24-734(5)(a), the Slaters did not offer any evidence at the hearing to support a finding of good cause to permit any out-of-state witness to testify at trial by videoconference.

[29] On appeal, the Slaters argue that the appellate record contains evidence to support a finding of good cause under § 24-734(5)(b)(iii), based on "undue burden or expense to a party or witness." The Slaters point to trial evidence regarding Wysocki's standard billing rates for traveling and testifying at trial, and they argue this evidence shows how expensive it would have been for Wysocki to testify in person at trial. But this evidence was not offered during the hearing on the Slaters' pretrial motion, and an issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal.[48]

On this record, it was not an abuse of discretion to deny the Slaters' pretrial motion to permit witness testimony by videoconference because they failed to satisfy their burden to show good cause under § 24-734(5)(a) and (b). And because there was no error in denying the motion under § 24-734(5), it is not necessary to consider the district court's alternative reasons

---

[48] *State v. Yzeta*, 313 Neb. 202, 983 N.W.2d 124 (2023).

for denying the motion,[49] including its belief that § 24-303(2) precludes any use of videoconferencing equipment during a jury trial.

For the sake of completeness, however, we acknowledge there is tension in the provisions of various Nebraska statutes that govern the use of telephone and videoconference technology in civil, juvenile, and criminal cases.[50] As a general principle, statutes pertaining to the same subject matter, being in pari materia, must be construed as if they were one law, giving effect to every provision and attempting to reconcile different provisions so that they are consistent, harmonious, and sensible, without rejecting any word, clause, or sentence as superfluous.[51] Here, we see nothing in the record suggesting the trial court engaged in this sort of analysis when it construed the videoconferencing provisions of § 24-303(2), but regardless, the issue was not assigned as error or argued

---

[49] See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

[50] See, e.g., § 24-303(2) (governing when evidentiary and nonevidentiary hearings in district court may be conducted telephonically, by videoconferencing, or by similar equipment); Neb. Rev. Stat. § 25-2704(2) (Cum. Supp. 2022) (governing when evidentiary and nonevidentiary hearings in county court may be conducted telephonically, by videoconferencing, or by similar equipment); Neb. Rev. Stat. § 43-278 (Reissue 2016) (governing when evidentiary and nonevidentiary hearings in juvenile court may be conducted telephonically or by videoconferencing); § 24-734(3) (governing when courts can use telephonic, videoconferencing, or similar methods to conduct "any proceeding . . . not involving testimony of witnesses by oral examination"); § 24-734(4) (governing when courts may permit witness testimony by telephonic, videoconferencing, or similar methods in criminal cases); § 24-734(5) (governing when courts "shall" permit witness testimony by telephonic, videoconferencing, or similar methods in civil cases); Neb. Rev. Stat. §§ 29-4201 to 29-4207 (Reissue 2016 & Cum. Supp. 2022) (governing how and when courts may permit detainees or prisoners in nonevidentiary criminal proceedings to make an "audiovisual court appearance").

[51] See *In re Estate of McCormick*, 317 Neb. 960, 12 N.W.3d 802 (2024).

on appeal. As such, resolution of this appeal does not require that we address whether the videoconferencing provisions in §§ 24-303(2) and 24-734(5) can be reconciled in a way that is consistent, harmonious, and sensible, and we express no opinion in that regard.

## V. CONCLUSION

On this record, it was error to grant a directed verdict in favor of Ichtertz at the close of the Slaters' case in chief. We therefore reverse the judgment in favor of Ichtertz and remand the cause for a new trial.

Reversed and remanded for a new trial.

Heavican, C.J., not participating in the decision.

Papik, J., not participating.

Stacy, J., concurring.

I agree with the majority's analysis and holdings. I write separately to address an additional issue that may arise on remand: In a medical malpractice case where the evidence adduced is sufficient to survive a directed verdict under both a traditional negligence theory and under a res ipsa loquitur theory, is the jury instructed on both theories?

Obviously, the fact that the evidence in this appellate record was sufficient to survive a directed verdict under both a traditional negligence theory and a res ipsa loquitur theory does not mean that if, on retrial, the Slaters again choose to proceed under both theories, the evidence will again be sufficient on what may be a different evidentiary record. But in the event the district court determines on retrial that the Slaters have adduced sufficient evidence of both theories to survive a directed verdict, the court will need to decide how to instruct the jury. Our case law provides guidance on that issue.

First, it must be acknowledged that this court has long recognized a rule that generally permits plaintiffs to proceed at trial under both a theory of traditional negligence and a

theory of res ipsa loquitur.[1] We first recognized this rule in *Knies v. Lang*,[2] decided in 1928. *Knies* cited *Cassady v. Old Colony Street Railway*,[3] a decision from the Supreme Court of Massachusetts, as authority for the rule. *Cassady* rejected the argument that a plaintiff may not proceed at trial under both traditional negligence and res ipsa loquitur, and explained:

> The defendant also contends that, even if originally the doctrine [of res ipsa loquitur] would have been applicable, the plaintiff had lost or waived her rights under that doctrine, because instead of resting her case solely upon it she undertook to go further and show particularly the cause of the accident. This position is not tenable. It is true that where the [trial] evidence shows the precise cause of the accident, . . . there is of course no room for the application of the doctrine of presumption. The real cause being shown, there is no occasion to inquire as to what the presumption would have been if the cause had

---

[1] See, *Long v. Hacker*, 246 Neb. 547, 558, 520 N.W.2d 195, 203 (1994) ("introduction of some [trial] evidence which tends to show the specific acts of negligence on the part of the defendant, but which does not purport to furnish full and complete explanation of the occurrence, does not destroy the inferences which are consistent with the evidence and so does not deprive the plaintiff of the benefit of res ipsa loquitur"). See, also, *Anderson v. Union Pacific RR. Co.*, 295 Neb. 785, 792, 890 N.W.2d 791, 796 (2017) (noting plaintiff properly tried case on both theories, but holding district court erred in instructing jury on res ipsa loquitur because plaintiff adduced "direct evidence of the precise cause of the accident"); *Beatty v. Davis*, 224 Neb. 663, 665, 400 N.W.2d 850, 852 (1987) (explaining plaintiff can introduce evidence of specific acts of negligence and rely on res ipsa loquitur at trial, but if plaintiff adduces "direct evidence of the precise cause of the accident, the doctrine of res ipsa loquitur is not applicable"); *Knies v. Lang*, 116 Neb. 387, 391, 217 N.W. 615, 616 (1928) (recognizing res ipsa loquitur theory no longer available to plaintiff if trial evidence "'shows the precise cause of the accident'").

[2] *Knies, supra* note 1.

[3] *Cassady v. Old Colony Street Railway*, 184 Mass. 156, 68 N.E. 10 (1903).

not been shown. But if at the close of the evidence the cause does not clearly appear, or if there is a dispute as to what it is, then it is open to the plaintiff to argue upon the whole evidence, and the jury are justified in relying upon a presumption unless they are satisfied that the cause has been shown to be inconsistent with it. An unsuccessful attempt to prove by direct evidence the precise cause does not estop the plaintiff from relying upon the presumptions applicable to it.[4]

Since *Knies*, the Nebraska Supreme Court has consistently recited the rule that plaintiffs do not automatically lose the opportunity to rely on the theory of res ipsa loquitur by choosing to offer trial evidence tending to show a specific act or acts of negligence committed by the defendant.[5] In *Beatty v. Davis*,[6] we explain that it

"is quite generally agreed that the introduction of some evidence which tends to show specific acts of negligence on the part of the defendant, but which does not purport to furnish full and complete explanation of the occurrence does not destroy the inferences which are consistent with the evidence, and so does not deprive the plaintiff of the benefit of res ipsa loquitur. W. Prosser, Law of Torts 236 (3d ed. 1964)."

But once a plaintiff has adduced sufficient "direct evidence of the precise cause of the accident,"[7] they can lose the opportunity to rely on res ipsa loquitur, because there is no need for an inference of negligence even if there is

---

[4] *Id.* at 163, 68 N.E. at 12-13.

[5] See, *Anderson, supra* note 1; *Long, supra* note 1; *Beatty, supra* note 1.

[6] *Beatty, supra* note 1, 224 Neb. at 666, 400 N.W.2d at 853.

[7] *Anderson, supra* note 1, 295 Neb. at 792, 890 N.W.2d at 796. See, also, *Knies, supra* note 1; NJI2d Civ. 2.13, comment III at 215 (stating if "there is direct evidence of the precise cause of the accident, then res ipsa loquitur is in applicable [sic] and, of course, since the res ipsa doctrine is inapplicable," a jury instruction on it should not be given).

competent evidence to support it.[8] Other jurisdictions follow the same rule.[9]

In this appeal, it was not necessary to consider whether the Slaters adduced sufficient direct evidence of the precise cause of the ulnar nerve injury to preclude a jury instruction on the theory of res ipsa loquitur. But should the issue arise on remand, existing case law provides a framework for the trial court to apply when determining which theory or theories, if any, should be submitted to the jury at the close of all the evidence.

---

[8] See *Anderson, supra* note 1. See, also, Annot., 33 A.L.R.2d 791, 793 (1954) (stating there is "universally accepted rule that there is no room for or need for the operation of any inference or presumption under the res ipsa loquitur doctrine where the evidence in the case reveals all the facts and circumstances surrounding the occurrence in suit and clearly establishes the precise cause of the plaintiff's injury").

[9] See, generally, 1 Stuart M. Speiser, The Negligence Case: Res Ipsa Loquitor § 5:18 (Cum. Supp. 2025); 33 A.L.R.2d, *supra* note 7, § 4 at 806 (citing cases from over 20 jurisdictions and recognizing *Cassady, supra* note 3, as "the most frequently cited decision upon the subject").